CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
***** Harrisonburg Division *****

NOV 1 8 2021

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

DAVID B. BRIGGMAN,                              :
                                               :
        Plaintiff                              :
                                               :
v.                                             :        Case No. 5:21CV00074
                                               :
TIMOTHY A. MARTIN                              :
(Both individually and in his official capacity as   :
Commonwealth Attorney for Augusta County, VA), :
                                               :
        Defendant.                             :

## MEMORANDUM IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

On January 21, 2021, the Chief Judge of this Court entered Standing Order 2021-01[1],

which governs the filing of "highly sensitive documents" with this Court, which upon

information and belief would still have permitted the filing of ECF #678-2 in the case of *RLI*

*Insurance Company v. Nexus Services, Inc.,* without redaction on June 11, 2021. Nonetheless,

the Plaintiff was arrested for republication of that very document on his Facebook page. Notably,

neither party in the RLI case requested that filing be sealed by the Court. Plaintiff asks this Court

to issue a temporary restraining order (TRO) or preliminary injunction against the Defendant to

both dismiss the criminal charges pending against the Plaintiff, and the further infringement of

the Plaintiff's right to publish truthful, public information legally obtained from the government

or any other source.

---

[1] See http://www.vawd.uscourts.gov/media/31975974/management-of-highly-sensitive-documents.pdf , last
accessed November 17, 2021.

## FACTS

Plaintiff is a former employee of Nexus Services who resigned from his position on April 20, 2017 after discovering that the company and their owners were engaged in substantial criminal activity. (Complaint, paragraph 6). Within literally hours of his resignation, Plaintiff has been peppered with a number of criminal arrests on criminal process obtained by Nexus corporate officers, all of which have been dismissed at trial, and in the case of the assault charge brought against the Plaintiff, that charge was dismissed by the Staunton Commonwealth Attorney after the Plaintiff demonstrated that Richard Edward Moore had falsely sworn to a set of facts contained within a criminal complaint which caused Plaintiff's arrest. Moore stands currently indictment by the Augusta County Grand Jury for perjury. The President of Nexus Services, Moore's husband Michael Donovan, aka Micheal Donovan has now taken to obtaining criminal processes against the Plaintiff, which latest arrest is for an alleged violation of § 18.2-186.4 of the Code of Virginia, as amended. The criminal complaint of Donovan's was filed on November 13, 2021, and Plaintiff was arrested on that charge, and a companion charge of violation of a protective order on November 15, 2021. (Complaint at paragraphs 7 and 8). The criminal complaint merely alleges that the Plaintiff republished a court filing from the *RLI* case which contains Donovan's home address. Nine total charges by Nexus officers have been brought by Nexus officials in the Augusta General District Court, one in Staunton General District Court, and a handful in Harrisonburg and Rockingham General District Court. All charges brought to trial have resulted in findings "not unfavorable" to this Plaintiff. All were legally baseless. All were prosecuted in Augusta County by the Defendant.

Upon information and belief, the complainant through attorneys have sent "cease and desist letters" to local media, including but not limited to the Harrisonburg Daily News Record

and the Waynesboro News Virginian, which has dramatically limited local news about this ongoing criminal enterprise from seeing the light of day. As such, Plaintiff has regularly published links to the few media articles about the criminal and unethical exploits of Nexus Services, and in lieu of articles, has regularly published court filings from around the country about Nexus Services, and the two felons who own the company.

In 2001, the Virginia General Assembly passed what is commonly known as § 18.2-186.4, which was amended in 2007 and in 2010. The statute criminalizes publication of a certain class of information that is contained from sources such as PACER, or the GIS and other websites containing identical data as this Plaintiff has published. Further, the charge is raised to a felony if one publishes the same publicly available information about law enforcement officers. (Complaint at 15A). The Plaintiff asserts the statute in question is related to § 59.1-443.2, except with criminal punishment in lieu of civil sanctions, and the unconstitutionality of the statute was established by Judge Payne in the Eastern District of Virginia in *Ostergren v. McDonnell,* 643 F.Supp.2d 758 (2011), which was largely upheld by the 4th Circuit Court of Appeals. Additionally, the Office of the Attorney General of Virginia entered into a Consent Order that would forever bar prosecutions for alleged violations under most conditions. (Complaint at paragraphs 9 and 10). Thus, the existence of § 18.2-186.4 in substantial danger of being repeatedly arrested and prosecuted by the Defendant for merely posting court filings and other legally-obtained information about Nexus Services and/or their corporate officers.

### ARGUMENT

"In deciding whether to issue a preliminary injunction, a court must consider (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the

likelihood that the plaintiff will succeed on the merits, and (4) the public interest."
*Newsome v. Albemarle County Sch. Bd.,* 354 F.3d 249 (4th Cir. 2003) (internal quotation marks and citation omitted).

"The balance-of-hardship test correctly emphasizes that, where serious issues are before the court, it is a sound idea to maintain the status quo ante litem, provided that it can be done without imposing too excessive an interim burden upon the defendant, ... for otherwise effective relief may become impossible." *Blackwelder v. Seilig Mfg. Co.,* 550 F.2d 189, 194-95 (4th Cir. 1977). In applying this balancing test, primary importance must be attached to the vindication of the plaintiffs right and the potential injury to it if the preliminary injunction is not granted: "It is sufficient (to grant the motion) if the court is satisfied that there is a probable right and a probable danger, and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant." *Id.* at 193 (quoting *Sinclair Refining Co. v. Midland Oil Co.,* 55 F.2d 42, 45 (4th Cir. 1932)).

## I.    THE BALANCE OF HARDSHIPS FAVORS PRELIMINARY RELIEF.

If a preliminary injunction or TRO is not granted, continued posting of similar information relating to individuals risk the criminal sanctions outlined above. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347 (1976). Plaintiff's social media postings relating to Nexus imparts news and information about a criminal entity, which may cause people to "feel like they're being coerced, intimidated, or harassed, but which actually constitutes speech of the sort "at the core of the First Amendment." *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466 (1988). He

is posting on a manner of vital public concern: civil and administrative actions and other related information about a criminal enterprise operating in our community, which has actually victimized numerous people in our community using legally obtained documents and freely-accessible public information. The public records posted to his site are essential to his message, in that they graphically illustrate the type of illegal and unethical activities this company has and continues to engage in with impunity.

By contrast, the Defendant will suffer no great harm should an injunction be granted. The Defendant will no doubt argue that allowing Plaintiff to continue posting documents in violation of the statute allows the Plaintiff to flout the law duly passed by our General Assembly and passed into law. However, our General Assembly regularly passes unconstitutional laws until such laws are challenged at trial, or in federal court as being facially unconstitutional. Plaintiff attempts to do this here. The statute allows for prosecution, in this matter, because the Plaintiff posted a legally obtained court document from this very court[2] on his social media page and said document contains the street address of the home of the complainant, while the very county in which the Defendant is an elected official, distributes the very same information if someone goes looking for it and those same sources of information will remain online and were placed there by the Augusta County government itself.

The balance of hardships decisively favors a preliminary injunction.

## II.     THE PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

### A.     Any Restriction on the Publication of Truthful Information Must be Narrowly Tailored to a State Interest of the Highest Order.

---

[2] Of note, Plaintiff posts court documents from the judiciary on his social media pages from across the country when he comes upon such filings he believes to be of general interest.

The defendant must pass a very high hurdle to defend this statute. "[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail,* 443 U.S. 97, 102 (1979). Indeed, in every case to address the issue, the Supreme Court has refused to allow government to sanction the publication of truthful information lawfully obtained, on matters of public concern. See, e.g., *Bartnicki v. Vopper,* 532 U.S. 514 (2001) (overruling damage award against radio commentator who broadcast contents of a private telephone call on a matter of public concern that had been unlawfully intercepted, where the tape was lawfully obtained by commentator); *The Florida Star v. B.J.F.,* 491 U.S. 524 (1989) (striking down damage award against newspaper that published the name of a rape victim obtained from police record); *Smith v. Daily Mail Pub. Co.,* 443 U.S. 97 (1979) (overturning newspaper's indictment for publishing the name of a juvenile offender); *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829 (1978) (overturning newspaper's conviction for publishing information about judicial disciplinary inquiry); *Oklahoma Publ'g Co. v. District Court In and For Oklahoma County,* 430 U.S. 308 (1977) (overturning injunction against publication of juvenile delinquency proceedings, when the press had been allowed to be present); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539 (1976) (overturning injunction against publication of information prejudicial to criminal defendant); *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469 (1975) (striking down damages award against reporter who broadcast the name of a rape Victim); *New York Times Co. v. U.S.,* 403 U.S. 713 (1971) (reversing injunction against publication of a classified study of the Vietnam War).

*The Florida Star v. B.J.F.,* 491 U.S. 524, 541 (1989), set forth the standard by which to evaluate such cases: "Where a newspaper[3] publishes truthful information which it has lawfully

---

[3] Although most of the Supreme Court cases in this area deal with newspapers, there is no reason to treat social media posts differently for First Amendment purposes. See *Sheehan v. Gregoire,* 272 F.Supp.2d 1135, 1145

obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order." The Court explained that such a stringent standard was necessary to strike the appropriate balance between individual privacy rights and free speech.

First, the Court noted that because only "lawfully obtained" information is protected, "the government retains ample means of safeguarding significant interests upon which publication may impinge," especially when the information is in the government's own custody:

> The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts.

491 U.S. at 534. See also *Landmark Communications, supra,* 435 U.S. at 845 ("[M]uch of the risk can be eliminated through careful internal procedures to protect the confidentiality of Commission proceedings"); *Oklahoma Publ'g,* 430 U.S. at 311 (noting trial judge's failure to close juvenile hearing to the public, including members of the press, who later broadcast juvenile defendant's name); *Cox Broadcasting, supra,* 420 U.S. at 496 ("If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information").

Second, "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *The Florida Star,* 491 U.S. at 535. That is, whatever harm is feared from making the information public already occurred when the *state* makes the information public. The Court observed that "where the government has made certain information publicly available, it is

---

(W.D. Wash. 2003) "Plaintiff's website, a vehicle of mass communication, is analytically indistinguishable from a newspaper. It communicates truthful lawfully-obtained, publicly-available personal identifying information with respect to a matter of public significance..."

highly anomalous to sanction persons other than the source of its release." *Id.* Thus, "once the truthful information was 'publicly revealed' or 'in the public domain' the [government may] not constitutionally restrain its dissemination." *Id.* (quoting *Daily Mail,* 443 U.S. at 103) (alteration added).

Third, a prohibition on publishing truthful information provided by the government itself could lead to "timidity and self-censorship" on the part of speakers:

> A contrary rule, depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication. This situation could inhere even where the newspaper's sole object was to reproduce, with no substantial change, the government's rendition of the event in question.

*Id.* at 536.

B.   The Prohibition on Disseminating Public Records Containing Identifying Information is Not Narrowly Taylored  a State Interest of the Highest Order.

The prohibition against publishing public records that contain identifying information is not "narrowly tailored to a state interest of the highest order." The plaintiff does not dispute that maintaining the privacy of some of the prohibited items of information is important, however, the information largely posted by the Plaintiff consists of court filings, including court filings made by the complainant himself in one of the pending criminal cases against this Plaintiff in the Augusta County General District Court. § 18.2-186.4 is not narrowly tailored — or even reasonably calculated — to achieve this interest.

First, the statute will not take even a single piece of identifiable information out of the public domain. As explained earlier, most all of the documents posted on Plaintiff's website are available via the internet from PACER and other government websites. Second, the Government has far more effective means to protect individual privacy: It can redact the items prohibited by

statute from being republished from public records, which in and of itself would render government GIS websites and other similar sites useless for the specific purposes that they serve. Instead, the government chooses to criminal individual who merely republish court and other documents to educate and inform the public about matters in the public interest, while the government freely provides often free and sometimes paid access to that very information.

In this respect, the prohibition on disseminating public records is even more poorly tailored that the restrictions considered by the Supreme Court in most the cases cited earlier. In nearly all of those cases, the government had made some effort to keep the information at issue confidential, but was thwarted by the mistake or misconduct of a government official, or the acts of third parties. In *The Florida Star,* the public police report inadvertently contained the rape victim's name, which was supposed to have been kept confidential. 491 U.S. at 546 (White, J., dissenting). In *Daily Mail,* the state kept secret the identity of the juvenile offender, but reporters learned his identity by interviewing eyewitnesses. 443 U.S. at 99. In *Oklahoma Publ'g,* the judge failed to follow the state law keeping juvenile proceedings closed. 430 U.S. at 311. In *New York Times,* the Pentagon Papers were classified, but were leaked by one of their authors.

Here, the state has made no effort to keep the identifying information covered by this statute confidential. Instead, the government becomes a literal vendor of much of this kind of information. In *Cox Broadcasting,* the Court made clear that there can be no liability for republishing what the government has deliberately made public. "At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." 420 U.S. at 496. In the instant matter, the Plaintiff stands charged with violating § 18.2-186.4 because he simply republished a

legally obtained document contained within a case file of this Court. Few things can be more offensive than the assault on Plaintiff's Constitutional rights pursuant to this statute.

> By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

*Id.* at 495. "*Cox Broadcasting* stands for the proposition that the State cannot make the press its first line of defense in withholding private information from the public — it cannot ask the press to secrete private facts that the State makes no effort to safeguard in the first place." *The Florida Star,* 491 U.S. at 544, White, J., dissenting.

For these reasons, in a case nearly identical to this one, a district court judge found that the state could not prohibit an individual from posting personal information obtained from public records on his own website. *Sheehan v. Gregoire,* 272 F.Supp.2d 1135 (W.D. Wash. 2003). The statute in that case prohibited the distribution of the residential address, residential telephone number, birth date, or social security number of any law enforcement officer, corrections officer, or court employee. The plaintiff's website, which dealt with police accountability, contained such personal information, which he had obtained from public records. Relying on *The Florida Star,* the court held that the statute did not serve a "state interest of the highest interest," since the state itself had made the information public. 272 F.Supp.2d at 1144-45.

## III.   A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

The public interest is not served by the enforcement of an unconstitutional statute.

*Newsom,* 354 F.3d at 261 ("Surely, upholding constitutional rights serves the public interest.") Although the public has an interest in protecting the privacy of some classes of information covered by the statute, a preliminary injunction will not frustrate this interest. As explained at length above, most all of the documents on Plaintiff's social media pages are readily available through the internet from the government itself, including the files of this Court.

## CONCLUSION

For the foregoing reasons, the plaintiff respectfully requests the Court to enter a preliminary injunction prohibiting the Defendant from enforcing Va. Code. Ann.§ 18.2-186.4 against the Plaintiff.

DATED: NOVEMBER 18, 2021

Respectfully submitted,

DAVID B. BRIGGMAN, Plaintiff, *Pro Se*
7556 Mountain Valley Road
Keezletown, Virginia 22832
(540) 246-5252
briggman@gmail.com